We concur,
David Johnson, W-. Harper, B, F. Dunkin.
*441 Under the above opinion of tbe Appeal Court this cause was again heard on the circuit, before Chancellor Johnston, July Term, 1841. His decree, upon the rehearing, is as follows:
It is unnecessary to state this case. It was heard by Chancellor Dunkin and, upon an appeal from his decree, which states the circumstances of the case, a new trial was ordered. I have heard the cause again, and little additional light has been obtained, in the way of evidence, with regard to the fairness of the purchase, by the admin-istratrix, of the negroes, which is the most rational point in the case. There is some contrariety in the proof: a witness was examined, who stated facts sufficient to condemn the purchase, but his veracity was so impeached as to render it unsafe to forward a decree upon his testimony; on the other hand, circumstances came out which rendered it probable that if the three negroes had not been sold together, they would have brought more, and which tended to show, that these things were mistaken by those, who concurring with the defendants, were of opinion that Will & Lett were worthless and would have brought nothing if they had not been put up with Maria. The two negroes were sold at Sheriff’s sale about two years afterwards, when there could have been but little alteration in them, and brought 280 dollars. Of course, the difference between the Sheriff’s sale, and that made by the administrators was decidedly against the former; no credit was given at the Sheriff’s sale, and there was no warranty of soundness, or of title.
The times had grown worse, and yet these negroes which, according to the defendants’ witnesses, it was necessary to get off, by throwing them into a lot with another negro of acknowdedged value, sold at the price stated, to a gentleman of experience and judgment. What is remarkable is, that while Lett, who was rather preferred by the defendants’ witnesses, sold for but $110, and Will, who was perfectly scouted at, brought $170; and it was proved by the overseer, who superintended him, that he worked well, and was, notwithstanding his deformities, half as valuable as a perfect negro of his own age. Really, it does appear to me to be a mockery to enter into an enquiry into the fairness, or unfairness of a purchase made by a trustee *442 at his own sale. Here was a purchase, made 23 years ago;. the plaintiffs were infants at the time, and unless the unfairness was practiced in the most clumsy manner, the evidence of it could hardly reach them. . Most of the witnesses of the sale are probably dead. It would be difficult for the children to prove corruption, in the purchase. It is easy for the trustees to call upon persons present, and who really seeing no stratagem, must testify, that as far as they observed, the sale was fairly conducted; and yet, in this very case, we have the clearest evidence that three negroes, who on the 21st November, were valued by seven appraisers at 900 dollars, were bought by the ad-ministratrix, for herself, on the 11th December, at 600 dollars; and not only so, but every article she bought at the sale, was purchased at nearly the same depreciation. You cannot get at the means, by which this result was produced, but you know of loss sustained by the estate, from internal evidence, that cannot be mistaken. It is because the wrong may be done, when the device cannot be detected, that justice and policy alike demand, that no agent, or trustee, acting for others, shall be allowed to act for himself. A principle which forbids the public land agent to become a bidder, the Sheriff from buying at his own sale, the factor whom you entrust with your cotton from making you a return, that he has taken it to himself, as a purchaser, and the administrator, who undertakes to sell, and is, therefore, in the transaction, a trustee to sell, from bidding for himself. The principle shields him from temptations of self interest, which, from the infirmity of our nature, will oftener trample over duty than yield to it. It is an eternal truth that no man can serve two masters: the trustee pursues the path of duty with most fidelity, and least destruction, when it does not cross that of self interest. I should set this purchase aside, if it could serve any purpose, but if it were set aside, the effect of that would be, to restore the negroes purchased, to the estate. What has been done amounts to, that Maria has been accounted for by the decree, establishing that, she belonged, in fact, to Elijah Gayden: Will and Lett were levied on, and sold at their full value to satisfy debts of the intestate. So that if the plaintiffs insist on "dividing the purchase, and making *443 the administrators account for Will and Lett, the account is rendered by shewing the sale by the Sheriff, and the application of the money. In the opinion of the Appeal Court, there were one or two suggestions, to which I have attended. One of them was, that if the administrators, by bidding at the sale, obstructed the sale, and prevented the accumulation of funds to pay the debts, they might possibly be liable for the loss the estate truly sustained. If the two negroes who really belonged to the estate, sold at Sheriff’s sale, as I think they did, at their full value, the estate sustained no loss by Mrs. Gayden’s purchase.
Another suggestion was, that if the real value of the assets was sufficient to pay the debts, the administrators might be held accountable for the value of the land, which was sacrificed, in consequence of their failing to apply the funds in their hands in satisfaction of the debts.
The debts of the estate, exclusive of costs, added to the necessary administration expenses, which were proved before me, amounted to about 410 dollars; charging the administrators with Will and Lett, 280 dollars, which they brought when sold by the Sheriff to Dr. Jones, and with the residue of the purchases at the appraised value, which was $302, the assets in their hands were, at the utmost, $580. Of course, on this trial, it was not required that the defendants should show every debt which existed, but only that there was such a degree of indebtedness as, compared with the means in their hands, could not probably be met by reasonable diligence. The proof was made, generally, that the estate was much involved, and particular debts were brought forward as specimens. The presumption is that there were other demands, equal to, and exceeding, the purchases of the administratrix, rating the purchases at ap-praisement prices. The creditors seem to have pressed before. In all probability the purchases made by the third person at the sale could be realized, on the whole, under these conditions. I do not perceive evidence of wilful fraud in the administrators in this matter.
I cannot therefore direct the court, in the account to be taken, to charge the administrators with the value of the land.
Let the account be taken on the ordinary principles. *444 The question of costs is reserved. I cannot close the opinion, without observing, that there was no evidence whatever to show that the administrator, Flemming, concurred with Mrs. Gayden in her purchase of the slaves.
The complainants appealed from Chancellor Johnston’s last decree and moved to modify the same.
1. Because the decree should have made chargeable both administrators, with the value of the lands.
2. Because, Flemming, the administrator, should have ben chargeable for the negroes, as well as all the personalty bid off by Fanny Gayden, the administratrix.
3. Because the decree should have made chargeable the administrators (both,) with the whole, personally, at the appraised value, or at an appraised value, allowing them to be credited with debts, and necessary expenses, actually paid out.
And the defendants appealed, because the bill, as to Flemming, should have been dismissed with costs.
Curia, per Harper, Chancellor.
The principal question raised, with respect to all the grounds of appeal, was, whether, in the event of any balance being found due by the administratrix, Fanny Gayden, the administrator, Peter Flemming, will be liable for the amount. It is said, in the former opinion of this Court, that one administrator is not liable for the acts of another, in which he did not concur. As this seems to have misled, and perhaps was calculated to mislead the parties, we have thought it proper to give the subject a full and thorough examination. The doctrine, as laid down, is perfectly correct. In many authorities, as well as in the case of O'Neall vs. Herbert, referred to, it is expressly held, both with regard to executors and administrators, that they are not liable for each other’s acts. Though, at law, both may be jointly liable on their bond, yet this Court discriminates and charges each with his own proper defaults. It cannot be questioned, and has not been questioned, that, at law, both must be liable on the administration bond. At law, both are regarded as principals; but in equity, they are regarded only as the sureties of each other. But when the surety is before the Court, why should it not give complete relief, ac *445 cording to its usual course, by affording a remedy against the surety'? The case of O' Neall vs. Herbert, has no application, whatever, to this matter ; though, in that case, it is expressly said, that co-administrators are sureties of each other, on their administration bond. It is true, that in the case of Glen vs. Connor, State Rep. Eq. 267, followed by that of Teague vs. Dendy, 2 McCord. Ch. 209, where a bill was filed against the principal, to which the sureties were made parties, the bill was dismissed as against the sureties. But in McAbee vs. Crocker, Mass. Book, (F. R. 19,) where one administrator was absent from the State, and only made a party by advertisement, it was held, that the sureties were properly made parties, along with the other administrator, and a decree was made against them. It is said in that case, by the Judge who delivered the opinion of the Court, “ In equity, the Court possesses all the powers to do exact justice between the parties. It. can examine the accounts, fix the administrator’s liability, and direct him to be pursued to insolvency, before the sureties shall be liable to process to enforce the decree.” To this it may be added, that if the surety should be compelled to pay the money, it can afford him the process of the Court, to reimburse himself, at any time there should appear to be a chance of his doing so. The Judge expresses his dissatisfaction with the case of Glen vs. Connor, and Teague vs. Dendy, and I concur in his dissatisfaction. They are opposed to the general maxim of equity, that all persons having material interests, must be made parties to the suit. Can it be doubted, but that the sureties have a most material interest in the subject of the suit against their principal'? Great injustice might be done to sureties, by failing to make them parties to a suit against an insolvent principal, who might feel little interest in defending himself. Plaintiffs would have no temptation to make the sureties parties, unnecessarily; and if they did so, might be made responsible in costs. I should think that, when they are made parties, the bill should allege the insolvency, or, as in McAbee vs. Crocker, the absence of the principal. But, whatever may be the merits of the cases of Teague vs. Dendy, and Glen vs. Connor, they cannot govern the present. The surety, the co-administrator, is before the *446 Court, and properly before it; and it would be in contradiction. to all the maxims of the Court, to refuse full relief, which will put an end to the litigation, and send the complainants to litigate in another jurisdiction, where less ample justice can be done. In the cases of Lidderdale vs. Robinson, 2 Brockenb. 164, and Green vs. Hanberry's Executors, id. 420, it was laid down by Chief Justice Marshall, sitting in chancery, as the unquestioned, law, that one co-administrator is surety for the other, and liable for his defaults. In the former case, where lie had not been made a party, the Chief Justice directed him to be made one; and in the latter, where he had not been a party to a former suit, held him not to be bound by the decree. Then, as to making the administratrix answerable for the true value of the land, this must be on the score, that the neglecting to make proper provision for the payment of all the debts, to satisfy which the land was sold, and to pay them, was such laches as to render the administrator liable for the full value. This is rather an unusual claim. Certainly, it is the business of the administrator to pay debts out of the personal estate; yet, circumstances may exist, though he should have funds in his hands, to render it convenient, or advisable to permit land to be sold for the payment of debts, without his being able to ánticipate that it would be sacrificed. But, whatever may be the merits of the claim, I am satisfied that it cannot be decided on until the account is taken. The decision will depend on the condition of the estate, its resoursces, the amount of debts, <fcc., which are to be ascertained by the result of the account. The Chancellor says, with respect to the debts, “proof was made, generally, that the estate was much involved, and particular debts were brought forward as specimens.” The presumption is, that there were other demands, equal to, and exceeding the purchases of the admin-istratrix. The same thing may be said of the laches' charged against the administrators, in failing to redeem the girl, Maria, who was mortgaged. And though the sale bill had fallen due, it does not follow that the money had been collected. The girl was, in fact, sold for $460, (a compulsory sale, if the administrators had not the means of redeeming,) and the Chancellor who first heard the cause, *447 says, tliat lie could not fix her value at more than $400. When it is said, that the administratrix must he regarded as having funds in her hands, to the amount of her purchases, this must be taken to relate to the negroes, Lett and Will, for the title to Maria was in a third person. And with respect to these, as they were afterwards sold to satisfy the debts of the estate, it may be supposed that the administratrix was aware that she Gould not retain her purchases, and submitted that they should be so sold. The Chancellor concludes that they were sold at their full value; Maria being sold at $460, and Lett and Will at $280, makes the entire sale $740. The decree is affirmed.
Clinton, Solicitor for Complainants.
Wright, Solicitor for Defendants.
WM. HARPER.